IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ETTA AND FRANK CHIEF, individually and on behalf of BRANDON CHIEF, TAYZHA CHIEF, and ALISHA CHIEF,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>WEST VALLEY CITY, WEST VALLEY CITY POLICE DEPARTMENT, THAYNE NIELSEN, individually and as West Valley City Chief of Police, OFFICER LEVI LLOYD, individually and in his official capacity, OFFICER MATTHEW MADSEN, individually and in his official capacity, OFFICER TYLER HITZ, individually and in his official capacity, and JOHN DOES I–V,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS<br><br><br><br>Case No. 2:11-CV-643 TS |

This matter is before the Court on several motions, namely, (1) Plaintiffs' Motion to Strike, (2) Defendants' Motion for Summary Judgment, (3) Cross Motions for Partial Summary Judgment on Plaintiffs' unlawful entry claim, and (4) Cross Motions for Summary Judgment on Plaintiffs' illegal seizure and detention claim. For the reasons stated below, the Court will enter judgment in favor of Defendants on all claims.

1

## I. BACKGROUND

This case arises from an officer-involved shooting that occurred on December 17, 2010. Twenty-one year old Brandon Chief ("Mr. Chief") was shot to death by West Valley City ("WVC") police officer Levi Lloyd, who was responding to a domestic assault call.

Prior to the shooting, Mr. Chief and his thirteen-year-old niece Tayzha got into a fight. Mr. Chief continued to fight with Tayzha and eventually with his father Frank. Tayzha called 911 as Mr. Chief continued to fight with his father. At one point during the call Tayzha said, "My uncle is fighting with my grandpa now. Can you please come?"[1] Later in the call she stated, "My grandpa is getting beat up."[2] Mr. Chief began throwing things in the kitchen and his bedroom, breaking at least one window. At one point during the melee, Mr. Chief retrieved a knife from a kitchen drawer.

Officer Lloyd and Officer Hitz responded to the call and headed toward the Chief home. Another officer keyed into the radio transmission and stated, "That assault, that should be Brandon Chief, born in '89. He's got a long history and also owns a rifle."[3] Based on that additional information, Officer Lloyd asked for a third officer to assist.

When the officers arrived, they found Tayzha, Alisha, and a friend outside in the driveway. The officers found Tayzha "puffy" and "bleeding" from her ear. The officers stopped to speak with the girls for several seconds and then entered the home. The main front door of the

---

[1] Docket No. 61 Ex. 3, at 4.

[2] *Id.* at 5.

[3] *Id.* Ex. 5, at 2–3.

home was open but a glass storm or screen door was closed. According to Officer Lloyd, Tayzha gave the officers permission to enter the home. Tayzha contends that she did not consent to the officers entering the home but admits that she did not tell the officers they could not enter.

After entering the home, the officers quickly encountered Mr. Chief in the intersection of two hallways, at which point Mr. Chief turned away and started down a hallway toward the back of the house. Because of the layout of the home, Officer Lloyd was the only eyewitness to most of Mr. Chief's actions. Officer Lloyd claims to have instructed Mr. Chief to turn back around and come talk to the officers. Officer Lloyd testified that when Mr. Chief turned around, he observed Mr. Chief draw a kitchen paring knife with a three-to-four inch blade from his shorts. Officer Lloyd testified that he began backpedaling as Mr. Chief advanced while waving the knife back and forth. Officer Lloyd fired four shots; three hit Mr. Chief.

The other responding officers testified that numerous events happened almost simultaneously. They heard Officer Lloyd yell, "Whoa Whoa Whoa,"[4] and saw him start backing up, draw his gun, shoot, and proclaim, "He's got a knife."[5] While Officer Lloyd and Frank Chief both testified that Officer Lloyd told Mr. Chief to drop the knife, neither Officer Madsen nor Officer Hitz heard Officer Lloyd issue that command.

Officer Lloyd testified that immediately prior to the shooting Mr. Chief was facing him, waving the knife back and forth, and speaking aggressively.[6] Officer Lloyd testified that he

---

[4]*Id.* Ex. 15, at 128.

[5]*Id.*

[6]*Id.* Ex. 6, at 151.

began backpedaling, drew his handgun from his holster, and began firing. After the shots were fired, Officer Madsen saw Mr. Chief come around the intersection of the two hallways and square up with the officers. Officer Hitz drew his firearm but did not shoot. Officer Madsen deployed his taser.

There is conflicting evidence about how Mr. Chief was standing during the encounter with the officers. There is evidence that the trajectories of the three gunshot wounds sustained by Mr. Chief show he was turned at an angle of at least forty-five degrees or more away from Officer Lloyd when he was shot. One of the bullets entered through his chest and exited his right arm, lodging in his tricep. Another bullet entered Mr. Chief's body from the rear, in his left flank. A third bullet entered the lower left side of his chest and was recovered from the right abdominal wall. The chronological sequence of these shots is unclear.

Mr. Chief's estate, as well as his parents, Frank and Etta Chief, and his nieces, Tayzha and Alisha Chief, filed this § 1983 civil rights action[7] asserting seven claims for relief, punitive damages, and attorney's fees. The claims are as follows: (1) deprivation of constitutional rights, (2) unlawful search and seizure, (3) right to privacy, (4) right to personal security, (5) wrongful death, (6) intentional infliction of emotional distress, and (7) violations of Utah's Governmental Records Access and Management Act.

---

[7]Plaintiffs allege constitutional violations of both the United States Constitution and the Constitution of the State of Utah. The protections provided under these two constitutions are substantially similar and the parties do not raise any substantive differences between the two. Therefore, the Court will analyze the causes of action under the federal constitutional framework.

There are a number of claims that Plaintiffs admit are subject to dismissal at this stage. Based on this concession the Court will grant summary judgment in favor of Defendants on the following claims: right to privacy, right to personal security, infliction of emotional distress, and violations of the Government Records Access and Management Act claims.

Thus, the claims left for consideration are (1) deprivation of constitutional rights, where the Court will analyze allegations of excessive force, unlawful entry, and wrongful detention against the individual officers, the Chief of Police, and the municipality, and (2) wrongful death.

## II.  MOTION TO STRIKE

Before addressing the Motions for Summary Judgment, the Court will consider Plaintiffs' Motion to Strike.  Plaintiffs seek to strike Defendants' summary judgment memoranda or certain language from the memoranda, arguing that Defendants have consistently overreacted to the evidence and exaggerated and fabricated facts.  Plaintiffs take issue with Defendants' descriptions of the fight between Mr. Chief and Tayzha, including assertions that Mr. Chief "brutally attacked" Tayzha and left her "seriously wounded" as she called for an "ambulance."

Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[8] However, DUCivR 7-1(b)(1)(B) states that, "[m]otions to strike evidence as inadmissible are no longer appropriate and should not be filed."[9]

---

[8]Fed. R. Civ. P. 12(f).

[9]DUCivR 7-1(b)(1)(B).

Plaintiffs' Motion to Strike is prohibited by DUCivR 7-1(b)(1)(B) and may be denied on that basis alone. Furthermore, while there are disputes about the intensity and severity of the altercation between Mr. Chief and Tayzha, Alisha, and Frank Chief, the various descriptions of the altercation are not immaterial or scandalous. Nor is the Court swayed by graphic or exaggerated language. Therefore, the Court will deny Plaintiffs' Motion to Strike.

## III. SHAM AFFIDAVITS

The Court turns next to whether the information contained in Plaintiffs' late-filed affidavits should be considered or whether the affidavits raise sham issues of fact. Frank and Tayzha filed affidavits in March 2013. They each filed a second affidavit on July 15, 2013. Frank's second affidavit addresses the provenance of the firearm that Mr. Chief supposedly possessed, his recollection of the shooting, and his treatment by police after the shooting. Tayzha's second affidavit addresses the events of December 17, 2010, leading up to the shooting, the 911 call, and events after officers arrived.

The Tenth Circuit has stated that "[w]e will disregard a contrary affidavit . . . when it constitutes an attempt to create a sham fact issue."[10] Factors for the Court to consider in determining whether an affidavit creates a sham fact issue include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to

---

[10]*Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1282 (10th Cir. 2003).

explain."[11]  For the district court to disregard an affidavit from consideration, the Court must "first determine whether the conflicting affidavit is simply an attempt to create a sham fact issue."[12]  In doing so, courts can look at the timing in executing the affidavit.[13]  The filing of an affidavit on the same day as a memorandum in opposition to a motion for summary judgment places the moving party at a disadvantage, and deprives that party of any chance to pursue discovery on the subjects covered in the affidavit.[14]

Both Frank and Tayzha were deposed prior to submitting their second affidavits.  They had access then to the same pertinent information that they submitted in the second affidavits and there is no newly discovered evidence addressed in the second affidavits.  Frank and Tayzha were both represented by counsel at their depositions.  Their counsel cross-examined them about their testimony and they had the opportunity to clarify any confusion.  Frank and Tayzha provided specific testimony in their depositions about the same subjects raised in their second affidavits and, for the most part, their second affidavits are consistent with their previous testimony.  There does not appear to be any bad faith, nor is there information indicating that the affidavits were filed simply as an attempt to create a sham fact issue.  However, there is one discrepancy in Frank's second affidavit that contradicts Frank's previous deposition testimony.

---

[11]*Id.* (internal quotation marks omitted).

[12]*Id.* (internal quotation marks omitted).

[13]*See, e.g.*, *Juarez v. Utah Dep't of Health-Family Dental Plan*, No. 2:05-CV-0053, 2006 WL 2623905, at *8 (D. Utah Sept. 11, 2006).

[14]*Id.*

Frank testified in his deposition that, after Mr. Chief was shot, an officer told Frank to leave the home, so he left.[15]  In his second affidavit, Frank claims he was taken into police custody and escorted from the home by police officers, one of whom was Officer Hitz.[16] Considering the factors set out above, the Court finds that the affidavit raises a sham fact issue in an attempt to preclude summary judgment against the individual officers on Plaintiffs' wrongful seizure and detention claim.  Therefore, Frank's statement that he was escorted from his home by Officer Hitz will be disregarded.

While the Court will disregard the one statement in Frank's declaration, Tayzha's affidavit does not create sham issues of fact.  Tayzha stated that the express purpose of her second affidavit was to help clarify what happened on the night her uncle was killed, and to address what she considers to be distortions, misstatements, and misrepresentations about what she has said and what her role was in the incident that night.  These statements are more fairly characterized as supplemental rather than contradictory.  For these reasons, the Court will disregard the contradiction raised in Frank's affidavit—that he was escorted from his home by Officer Hitz—but will consider the remaining statements.

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[17]  In

---

[15]Docket No. 163 Ex. 2A, at 167.

[16]*Id.* Ex. 2, at 5.

[17]Fed. R. Civ. P. 56(a).

considering whether a genuine dispute as to any material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[18] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[19]

## V. DISCUSSION

### A. CLAIMS NOT PLEADED

Defendants recognize that the Amended Complaint included allegations that could be read to support a substantive and procedural due process claim and an Eighth Amendment claim. Plaintiffs argue that they affirmatively pleaded such claims and that the claims survive summary judgment. The Court finds that Plaintiffs have not pleaded a claim for violation of their due process or Eighth Amendment rights. Because the Court previously denied leave to amend,[20] no such claims are at issue in this case.

### B. WEST VALLEY CITY POLICE DEPARTMENT

Preliminarily, Defendants argue that the West Valley City Police Department ("WVC PD") is not a separate legal entity with the capacity to be sued. Indeed, a sub-unit of city government is not itself a governmental entity subject to suit.[21] Entities such as the WVC PD are

---

[18]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[19]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[20]Docket No. 188.

[21]*Fail v. W. Valley City*, No. 2:04-CV-1094, 2006 WL 842910, at *2 (D. Utah Mar. 28, 2006) (citing *Whayne v. Kansas*, 980 F. Supp. 387, 391 (D. Kan. 1997)).

9

merely subordinate agencies of the city "and are not independent legal entities with the capacity to sue or be sued."[22]  Accordingly, the Court will dismiss all claims against the WVC PD with prejudice.

## C.    SUPERVISORY LIABILITY

Plaintiffs assert various claims against WVC PD Chief Thayne Nielsen ("Chief Nielsen"). Defendants argue those claims cannot survive summary judgment.

"Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights."[23]  For supervisor liability to be successful, "it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation.  Instead . . . the plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional rights."[24]

To succeed in a § 1983 suit against a defendant-supervisor, Plaintiffs must demonstrate "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."[25] "Because mere negligence is not enough to hold a supervisor liable under § 1983, a plaintiff must

---

[22]*Redmond v. Salt Lake City Police Dep't*, No. 2:08-CV-153, 2009 WL 675628, at *2 n.1 (D. Utah Mar. 10, 2009) (dismissing claims against Salt Lake City Police Department and Salt Lake County Sheriff's Office).

[23]*Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006).

[24]*Id.* (internal quotation marks and citation omitted).

[25]*Dodds v. Richardson*, 614 F.3d 1185, 1199–1200 (10th Cir. 2010).

establish the supervisor acted knowingly or with deliberate indifference that a constitutional violation would occur."[26]

Plaintiffs argue broadly that WVC PD maintains written policies as well as several unwritten policies and customs that contributed to Mr. Chief's death because they were aggressive, out-of-date, and/or inefficient. Plaintiffs further argue that there is a growing body of evidence that there were and are serious systemic issues in the WVC PD for which Chief Nielsen ought to be accountable.

Defendants contend that summary judgment is warranted on all claims against Chief Nielsen. Defendants contend that there is no evidence that the individual officers violated the Constitution and that there can be no supervisory liability absent a constitutional violation.[27] Defendants further maintain that Plaintiffs make only unsubstantiated allegations that Chief Nielsen should be liable.

Chief Nielsen was not at Mr. Chief's home during the incident, nor did he have any communications with the officers about how to handle the situation at Mr. Chief's residence. Plaintiffs claim that the deadly force policy was out-of-date and inadequate. Even if that is true, there is no evidence Chief Nielsen promulgated, created, implemented, or possessed responsibility for the continued operation of the use of force policy or any other policies at issue. If there were a constitutionally deficient policy or practice, there is no evidence that Chief Nielsen acted knowingly or with deliberate indifference that a constitutional violation would

---

[26]*Serna*, 455 F.3d at 1151 (internal quotation marks and citation omitted).

[27]*Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).

occur.  Because there are no facts to support a claim against Chief Nielsen, there can be no supervisory liability.  Therefore, the Court will grant summary judgment in favor of Defendants as to the claims against Chief Nielsen.

D.    MUNICIPAL LIABILITY

Plaintiffs also assert constitutional claims against West Valley City.  A municipality may not be held liable under § 1983 merely because it employs a person who violated a plaintiff's federally protected rights.[28]  Municipalities can only be held liable in a § 1983 suit where their policies are the moving force behind an actual constitutional violation.[29]  "Liability can be imposed on the [municipality] only if (1) an underlying constitutional violation occurred, and (2) the violation was caused by a government policy or custom."[30]  There must be a direct causal link between the policy or custom and the officer's alleged constitutional violation.[31]

Plaintiffs contend that the city's policies are unreasonable, out of date, inadequate, and not reflective of current use-of-force options available to officers.[32]  Even if this is true, there must be a direct causal link between the policy or custom and any alleged constitutional violation.  There is no evidence that any of the city's policies, even if out of date and deficient,

---

[28]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[29]*Id.* at 694.

[30]*Whitewater v. Goss*, 192 F. App'x 794, 796–97 (10th Cir. 2006) (unpublished) (citing *Monell*, 436 U.S. at 694).

[31]*See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 399 (1997)).

[32]Docket No. 178 Ex. 3, at 6–8.

caused the alleged constitutional violations.  Therefore, the Court will grant summary judgment in favor of Defendants on the issue of municipal liability.

E.      QUALIFIED IMMUNITY

Plaintiffs allege that Defendants violated the Plaintiffs' federally protected constitutional rights by using excessive force against Mr. Chief, by unlawfully entering Mr. Chief's home, and by detaining members of Mr. Chief's family.  Defendants argue that they are entitled to qualified immunity on these claims.

A claim under § 1983 must allege the violation of a clearly established right secured by the Constitution and laws of the United States committed by a person acting under color of state law.[33]  There are three purposes served by qualified immunity.

> First, by reducing the threat of litigation, qualified immunity protects the public from unwarranted timidity on the part of public officials.  Second, qualified immunity helps to ensure that talented candidates are not deterred by the threat of damages suits from entering public services.  Third, qualified immunity reduces the chance that lawsuits will distract officials from their governmental duties.[34]

"Qualified immunity requires a two-step sequence."[35]  Courts can analyze these steps in any order they desire.[36]  "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2)

---

[33]*Bruner v. Baker*, 506 F.3d 1021, 1025–26 (10th Cir. 2007).

[34]*Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1166–67 (10th Cir. 2005) (internal quotation marks and citations omitted).

[35]*Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (citations omitted).

[36]*Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

13

the constitutional right was clearly established."[37]  Courts can analyze the prongs in any order they wish.  "Whether a right is 'clearly established' is an objective test: 'the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[38] Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law."[39] With this in mind, the Court considers the claims against the Defendant officers.

1.      EXCESSIVE FORCE

"A Fourth Amendment claim of excessive force is analyzed under the objective reasonableness standard that governs other Fourth Amendment inquiries."[40]  "There is no easy-to-apply legal test for whether an officer's use of deadly force is excessive; instead, we must slosh our way through the fact-bound morass of reasonableness."[41]  Reasonableness "must be judged from the perspective of a reasonable officer on the scene," who is "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[42]  The "reasonableness of a

---

[37]*Id*. (citations omitted).

[38]*Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).

[39]*Saucier v. Katz*, 522 U.S. 194, 202 (2001) (citations omitted).

[40]*Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009).

[41]*Id.*

[42]*Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[43]

An officer may use deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[44]  In assessing the degree of threat facing officers, courts consider the following factors:  "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[45]

### a.    Constitutional Violation

The Court first considers whether the forced used by each officer constitutes a constitutional violation.

### i.    Officer Hitz

Officer Hitz did not use any force against Mr. Chief, let alone excessive force.  Therefore, Officer Hitz is entitled to qualified immunity on Plaintiffs' excessive force claim.

### ii.    Officer Madsen

Officer Madsen deployed his taser on Mr. Chief when Mr. Chief was approximately eight-to-ten feet away.  Officer Madsen was the third officer in line when they entered Mr.

---

[43]*Id.* (citing *Graham*, 490 U.S. at 396).

[44]*Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

[45]*Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Chief's home.  Officer Madsen heard Officer Lloyd call out that Mr. Chief had a knife and he heard gunfire.  Still, moments after the shots were fired, Officer Madsen saw Mr. Chief advance to the intersection of the two hallways and square up with the officers.  Officer Madsen saw no evidence that Mr. Chief had been shot.  He then deployed his taser.  A reasonable officer on the scene, forced to make a split-second judgment in such a circumstance may do the same.  For this reason, the Court finds that Officer Madsen acted reasonably under the circumstances and did not violate Mr. Chief's Fourth Amendment rights.  As a result, Officer Madsen is entitled to qualified immunity on Plaintiffs' excessive force claim.

### iii.    Officer Lloyd

Officer Lloyd was the only person at Mr. Chief's home that night who actually saw Mr. Chief in the moments before he was shot.  Officer Lloyd testified that he saw Mr. Chief walking away from the officers and instructed Mr. Chief to come back to talk to the officers.  Instead, Mr. Chief retrieved a small knife and began to advance on Officer Lloyd.  Officer Lloyd may have commanded Mr. Chief to drop the knife but Mr. Chief did not drop the knife, instead he waved it around and advanced on Officer Lloyd.

In *Larsen v. Murr*,[46] an officer shot and killed Lyle Larsen after he called 911 threatening to kill someone or himself.[47]  Two officers arrived at the home and found Larsen on his front porch.[48]  As the officers approached, they realized that Larsen was wielding a knife that looked

---

[46] 511 F.3d 1255.

[47] *Id.* at 1258.

[48] *Id.*

like a small sword.[49]  The officers commanded Larsen to put the knife down on at least three

occasions.[50]  Before he was shot, Larsen turned and stepped toward one of the officers who was

on the sidewalk below.[51]  One of the officers shot twice and killed Mr. Larsen.[52]

The district court found no constitutional violation and granted summary judgment on all

claims and the Tenth Circuit affirmed.[53]  In affirming, the Tenth Circuit examined numerous

undisputed facts that support the heightened immediacy of the threat the officers faced.[54]  These

undisputed facts included that Larsen had already threatened violence, that the knife Larsen

wielded had a blade of more than a foot in length, that Larsen raised the knife, pointed the tip at

an officer and then stepped toward the officer.  It was also undisputed that Larsen and the officer

were between seven and twenty feet apart and that the other officer on the scene was prepared to

use force.[55]

The undisputed facts of this case show that officers were summoned to Mr. Chief's home

because of a 911 call of an ongoing assault.  Officers had information that Mr. Chief had a long

history with the police and possibly had access to a firearm.  Mr. Chief had not only threatened

---

[49]*Id.*

[50]*Id.*

[51]*Id.*

[52]*Id.* at 1258–59.

[53]*Id.* at 1258.

[54]*Id.* at 1260.

[55]*Id.* at 1260–61.

violence, but had already engaged in violence that appeared to be ongoing.  When officers

arrived they found Tayzha outside bleeding from her ear.  They noticed other evidence of a fight,

including a broken window inside the home.  The officers entered the home through a cramped

hallway, which meant only Officer Lloyd, as the first in line, could see Mr. Chief's movements

down another hallway.  Officer Lloyd instructed Mr. Chief to come back and talk with the

officers.  Instead Mr. Chief drew a knife.  Mr. Chief waved the knife at officers.  He cursed at the

officers and demanded that the officers retreat.  At some point, Mr. Chief advanced on Officer

Lloyd.  Officer Lloyd and Mr. Chief were in very close quarters, approximately five feet away

from each other.  All three officers were prepared to use force.

Plaintiffs claim that Mr. Chief was turning around, away from Officer Lloyd, to retreat to

the back of the house when he was shot.  The autopsy report shows that all of the bullets that hit

Mr. Chief did so from an angle.  One bullet entered in Mr. Chief's central chest and exited in his

right lateral chest; the bullet then re-entered in his right upper arm and lodged in his right tricep[56]

Another bullet entered in the left side of Mr. Chief's back.

There is conflicting evidence about how Mr. Chief was standing or facing during the

encounter with the officers.  When taken in the light most favorable to Plaintiffs, the evidence

indicates that Mr. Chief could have been turned at an angle of at least 45 degrees or more away

from Officer Lloyd when he was shot.  In opining on the bullet that entered Mr. Chief's chest and

lodged in his upper arm, Plaintiffs' forensic expert Robert Tressel noted that "[t]his wound

demonstrates that [Mr. Chief's] right upper arm was close to his right side when the shot was

[56]Docket No. 178 Ex. 12, at 1.

fired and not extended towards Officer Lloyd or raised above his shoulders."[57]  All shots were slightly downward in trajectory.

Dr. Christensen, the forensic pathologist who conducted Mr. Chief's autopsy, and Dr. Hiserodt, Plaintiffs' forensic expert, both testified that there is a possibility that Mr. Chief was turning away from Officer Lloyd at the time he was shot.  Dr. Christensen also indicated that it was possible that Mr. Chief was stooping or cowering at the time he was shot.  According to Dr. Christensen, at the time Mr. Chief sustained the chest wound—the only wound that traveled from front to back—he had to have had his right arm held close to his body with his shoulder slightly dipped downward.  However, Dr. Hiserodt testified that there was no possibility that the shot to the left flank was the first shot fired.[58]  Dr. Christensen similarly stated that Mr. Chief was "not fully backwards" when Mr. Chief was shot but the direction of travel of the wound is "largely across the body" suggesting that Mr. Chief could have been at an angle to the shooter.[59]  This physical evidence shows that a reasonable jury could find that Mr. Chief did not step toward Officer Lloyd when he was shot, but instead was turning around to retreat further into the back of the house.

In the end, there are disputed issues as to Mr. Chief's location in the house, his actions, and the sequence of the shots.  Thus, the Court finds that there are disputed issues of fact that

---

[57]*Id.* Ex. 3, at 4.

[58]Docket No. 195, at 27.

[59]Docket No. 193, at

prevent a determination of whether a constitutional violation occurred. Therefore, the Court will

proceed to a determination of whether the law was clearly established.

<em>b.       Clearly Established</em>

The second step of the qualified immunity inquiry turns on whether the right allegedly

violated—the right of Mr. Chief to remain free from having lethal force used against him under

the circumstances of December 17, 2010—was clearly established. "The contours of the right

must be sufficiently clear that a reasonable official would understand that what he is doing

violates the right."[60] "If the law did not put the officer on notice that his conduct would be

clearly unlawful, summary judgment based on qualified immunity is appropriate."[61]

Plaintiffs bear the burden of showing that the right in question was clearly established at

the time of the incident. Plaintiffs argue that Mr. Chief was turned away from Officer Lloyd at

the time he was shot and argue that Mr. Chief's right not to be shot in the back is clearly

established. Defendants claim that Mr. Chief was advancing on Officer Lloyd with a knife when

he was shot.

The physical evidence suggests that it may have been possible that Mr. Chief was turning

away from Officer Lloyd at the time that Officer Lloyd shot. However, there is no evidence that

Mr. Chief was fully turned away from Officer Lloyd, as Plaintiffs contend. Further, the parties

do not dispute that Mr. Chief advanced on the officers and continued to advance even after being

---

[60] *Saucier*, 533 U.S. at 202.

[61] *Id.*

shot until Mr. Chief came to the intersection of two hallways and squared up with the officers.[62] Plaintiffs contend that Mr. Chief advanced only after being shot. However, there is no evidence to support their position.

Plaintiffs' counsel rightly points out the differences between *Larsen* and this case, differences in the size of the knife Mr. Chief had and the manner in which Mr. Chief wielded the knife. Yet even if Mr. Chief were defensively wielding the knife and even if he were turning away from the officers in order to retreat into the back of the house, Officer Lloyd was not on notice that his conduct would be clearly unlawful in light of *Larsen*.

Finally, Plaintiffs' counsel concedes that Officer Lloyd is likely entitled to qualified immunity. Plaintiffs capitulate "[r]ealistically, however, Plaintiffs concede that Officers Lloyd, Madsen and Hitz may be entitled to qualified immunity on the limited issue of excessive force. Plaintiffs take this position with respect to the issue of excessive force primarily because . . . although the general standard for the use of deadly force is arguably clearly-established, with respect to the exercise of lethal force on someone in their home defensively wielding a small kitchen paring knife in response to officers' provocation of a violent confrontation, the law may not be as clearly established."[63]

Notwithstanding the possibility that a constitutional violation occurred, such right in this context cannot be said to be clearly established. The Court will therefore grant summary judgment to Officer Lloyd on Plaintiffs' excessive force claim.

---

[62]Docket No. 144 Ex. 11, at 144; Docket No. 178, at 17.

[63]Docket No. 178, at 50.

2.      UNCONSTITUTIONAL ENTRY

Defendants next argue that they are entitled to qualified immunity on Plaintiffs'

unconstitutional entry claim.  "A warrantless search or seizure is per se unreasonable unless

shown to fall within one of a carefully defined set of exceptions."[64]  Two such exceptions include

consent and exigent circumstances.[65]

     *a.      Consent*

Defendants argue that consent was given for the officers to enter Mr. Chief's residence.

According to Defendants, Plaintiffs manifested their consent to entry by (1) calling 911, asking

for help, and reporting Mr. Chief's aggressive behavior, (2) not objecting to the officers' entry,

and (3) nodding or saying "okay" to the officers' request to enter the home.  Plaintiffs contend

that the officers spoke to Tayzha, asked "Who else is in there?" and then simply entered the

house without asking for permission.[66]  Tayzha disputes that she gave permission for the officers

to enter the home.  Plaintiffs also argue that there is a genuine issue with respect to Tayzha's

capacity to consent, considering she was only thirteen years old at the time of the incident.

Although "[n]on-verbal conduct, considered with other factors, can constitute voluntary

consent,"[67] whether consent was given here is disputed.  "Acquiescence to the officers' presence

in the home does not provide sufficient grounds from which to infer consent to entry or consent

---

[64]*United States v. Lowe*, 999 F.2d 448, 451 (10th Cir. 1993).

[65]*United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006).

[66]Docket No. 61 Ex. 7, at 43.

[67]*United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (citations omitted).

to search."[68]  Tayzha's request for help in the 911 call and silence when officers indicated they were entering the home are factors that show consent is in dispute.

### b.    *Exigent Circumstances*

"A myriad of circumstances could fall within the term exigent circumstances."[69]  The two pronged test for exigent circumstances considers, "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."[70]  Courts are "guided by the realities of the situation presented by the record" and consider the facts from the viewpoint of "prudent, cautious, and trained officers."[71]  The manner and scope of the search is not at issue, therefore, the Court focuses on the objectively-reasonable prong.

Tayzha called 911 to report a contemporaneous emergency event: an ongoing assault. The responding officers were informed that the assault involved "Brandon Chief, born in '89. He's got a long history and also owns a rifle."[72]  During the 911 call, Tayzha indicated that Frank was "getting beat up" and that Mr. Chief "is fighting with my grandpa now."[73]  Tayzha reported that she could hear Mr. Chief breaking things in the house.  The officers were thus

---

[68]*United States v. Davis*, No. 01-40036-01, 2001 WL 1013313, at *5 (D. Kan. Aug. 7, 2001) (internal citations omitted).

[69]*Najar*, 451 F.3d at 714 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).

[70]*Id.* at 717–18.

[71]*Id.* at 719 (citing *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998)).

[72]Docket No. 61 Ex. 5, at 2–3.

[73]*Id.* Ex. 3, at 4–5.

responding to an assault in progress involving a person known to have a long history with police and who owned a rifle. These facts support a finding of exigency.

Plaintiffs rely on *United States v. Davis*[74] to argue that the entry was improper. In *Davis*, officers were able to check on the defendant's girlfriend, the purported victim of domestic violence, who appeared unharmed.[75] The defendant had no history of violence.[76] Both the defendant and his girlfriend insisted that the officers should remain outside, yet officers entered.[77]

Defendants rely on *Brigham City v. Stuart*[78] to justify their entry. In that case, officers responded to a call about a loud party at 3:00 am.[79] When officers arrived, they heard shouting and proceeded to investigate.[80] When they reached the backyard, they personally observed a juvenile punch another person.[81]

In this case, Tayzha's 911 call was over thirteen minutes long. When officers arrived they found Tayzha and two other girls safely outside, although Tayzha was bleeding from her ear.

---

[74]290 F.3d 1239 (10th Cir. 2000).

[75]*Id.* at 1244.

[76]*Id.* at 1240.

[77]*Id.* at 1241–43.

[78]547 U.S. 398 (2006).

[79]*Id.* at 400.

[80]*Id*. at 401.

[81]*Id.*

Officers saw that one of the house windows was broken. Tayzha indicated that Mr. Chief was still inside with his father who, minutes earlier, Tayzha reported was "getting beat up."[82]

The situation the officers encountered at Mr. Chief's home is distinguishable from *Brigham City* and *Davis*, but it is more akin to *Brigham City*. In *Brigham City,* the officers saw an assault in progress. In this case the officers did not see the assault, but they saw evidence of a prior assault and were informed of a possible ongoing assault. In *Davis*, the victim was safe outside. Here, Tayzha was safe in the driveway but there was evidence that another assault could have been occurring inside. Further, while the defendant in *Davis* had no criminal history, Mr. Chief did. Finally, officers also had information that Mr. Chief might have a rifle.

Plaintiffs contend that Tayzha's conversation with dispatch sounded more serious than the situation actually was because she was a dramatic thirteen-year-old girl. However, no matter how serious the situation actually was, the Court finds that the officers acted reasonably in entering based on the information they had at the time. Officers were informed of an ongoing domestic disturbance involving an individual with a prior criminal history who was known to own a gun. Upon arrival, officers saw that a window had been broken and could see that Tayzha had been in a fight and was bleeding. Based on these facts, the officers reasonably concluded that an assault was occurring inside. Therefore, the Court finds that exigent circumstances justified the officers' warrantless entry into Mr. Chief's home.

Finally, Plaintiffs argue that the officers created the exigent circumstance by overreacting to the information that Mr. Chief owned a rifle. This argument is without merit. In fact, courts

---

[82]Docket No. 61 Ex. 3, at 5.

"give substantial weight to police knowledge, or lack thereof, of a defendant's history prior to the incident under inquiry."[83] "The reasonableness of the officers' conduct hinges on the facts within their knowledge indicating exigency."[84] Rather than create the exigent circumstance, the information that the officers had supports the reasonableness of their warrantless entry.

    3.      SEIZURE AND DETENTION

Plaintiffs Frank, Etta, Tayzha, and Alisha allege that they were taken into custody and detained for more than four hours after Mr. Chief was shot.

Etta was not home at the time of the incident and was not detained or seized. Therefore, she cannot maintain a seizure claim. Plaintiffs Frank, Alisha, and Tayzha allege at least a four-hour detention where they were separated, cell phones were taken away, and they were transported to the police station for questioning. However, Plaintiffs do not allege any seizure or detention involving officers named in this lawsuit.

Plaintiffs cite to Frank's second affidavit to support their claim that Officer Hitz escorted Frank out of his home and placed him in a police vehicle where he was taken into custody, but the Court will disregard that statement for the reasons previously discussed.

Even if the Court were to consider Frank's second affidavit, that affidavit states that Frank and his granddaughter were "taken into police custody by WVC PD Officers, including Officers Beardshall, Trolson, McPhie, and Greco."[85] Plaintiffs have not alleged that a defendant

---

[83]*Id.*

[84]*United States v. Stewart*, 867 F.2d 581, 584 (10th Cir. 1989) (citation omitted).

[85]Docket No. 164 Ex. 2, at 2.

in this case violated a constitutional right and, therefore, there can be no liability.  Additionally,

Frank testified in his deposition that, after the shooting, an officer told him to leave the home, so

he left of his own volition.[86]  Consequently, Officers Lloyd, Hitz, and Madsen are entitled to

qualified immunity on this claim.

F.      WRONGFUL DEATH

        The Governmental Immunity Act of Utah ("GIAU") states that immunity is waived "as to

any injury proximately caused by a negligent act or omission of an employee committed within

the scope of employment."[87]  However, "[i]mmunity from suit of each governmental entity is not

waived . . . if the injury arises out of, in connection with, or results from . . . assault, battery . . .

or violation of civil rights."[88]  But an action can be maintained if "the employee acted or failed to

act through fraud or willful misconduct."[89]

        Defendants argue that the GIAU bars Plaintiffs' wrongful death claim.  Plaintiffs contend

that Defendants cannot use governmental immunity as a shield because the officers' behavior

involved willful misconduct rising to the level of malice.

        In *Thomson v. Salt Lake County*,[90] the district court dismissed the plaintiffs' state law

claims, including a wrongful death claim, against the governmental entity because they were

---

[86]Docket No. 163 Ex. 2A, at 67.

[87]Utah Code Ann. § 63G-7-301(4).

[88]*Id.* at § 63G-7-301(5)(b).

[89]*Id.* at § 63G-7-202(3)(c)(i).

[90]584 F.3d 1304 (10th Cir. 2009).

barred by the GIAU. Although Plaintiffs cite *Thomson* for the premise that qualified immunity is a fact-intensive issue that precludes summary judgment, the Tenth Circuit concluded that the district court did not err in granting summary judgment in favor of the defendants. The Tenth Circuit stated, "Even if we were inclined to deviate from our general rule and consider the merits of this argument . . . we would conclude that summary judgment was proper on these state-law claims."[91] As for the officers, Plaintiffs do not point to any evidence that the officers acted or failed to act through fraud or willful misconduct. Plaintiffs' wrongful death claim against the officers is therefore barred. For this reason, the Court will grant summary judgment in favor of Defendants on Plaintiffs' wrongful death claim.

## VI. CONCLUSION

It is therefore

ORDERED that Plaintiffs' Motion to Strike (Docket No. 163) is DENIED. It is further

ORDERED that Plaintiffs' Motion for Partial Summary Judgment on the unlawful entry claim (Docket No. 55) is DENIED and Defendants' Motion for Partial Summary Judgment for unconstitutional entry (Docket No. 62) is GRANTED. It is further

ORDERED that Plaintiffs' Motion for Partial Summary Judgment on the unlawful seizure and detention claim (Docket No. 122) is DENIED and Defendants' Motion for Partial Summary Judgment for illegal seizure (Docket No. 135) is GRANTED. It is further

---

[91]*Id.* at 1323.

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 144) is

GRANTED. The Clerk of Court is directed to enter judgment in favor of Defendants and against

Plaintiffs and close this case forthwith.

DATED   November 21, 2013.

BY THE COURT:

_____

TED STEWART
United States District Judge